May it please the court, I'm Knute Johnson, I represent Kira Zielinski, who is the appellant and defendant in this case. And I had asked and I will stick to asking for three minutes rebuttal. Your honors, the issue in this case is fairly straightforward. You know, does this statute apply to a parent who is fleeing to protect a child from domestic violence? The court itself, the district court at docket entry 65 noted there that in, and that's the order where she denied the defense, said that the question before us is whether sexual violence constitutes domestic violence under 1204 C2. It almost certainly does. And then the court said, but the violence has to be against the parent, not against the child. There is certainly nothing in the statute that limits it in that way, grammatically or in any other way. The government has focused this court on the word flee, say, arguing you can only flee to protect yourself, which flies in the face of many, many common uses of the word flee. People flee a war to save their children. And it also, and perhaps more importantly, ignores the fact that children are part of the domestic unit. And a parent, of course, has a duty to defend a child and has a right to defend a child. And Congress, if they wanted to limit this to only danger against the child, certainly, I meant the And we know that because a domestic unit includes children as well as the parent, it would seem obvious then that violence against the child would be part of domestic violence, that a parent can flee with the child in order to save the child. And the government's argument is that a parent has no right to defend the child under that circumstance. In which case, I would suggest the statute makes no sense whatsoever. Congress intended to protect children with this statute. It intended to protect them from parents who were stealing them and taking them over international borders when they should have. Implicit in that, too, protection of children would necessarily mean that the parent can protect a child from domestic violence and from sexual violence from a parent. We know that both state and federal law, as the district court recognized, see sexual violence and particular violence against children also to be domestic violence. Under Iowa, it's domestic abuses between family members who resided together at the time of the assault. Under federal law, 18 U.S.C. section 921A33A, Congress defined the misdemeanor crime of domestic violence to include a parent's physical force against a child. And that's exactly what was happening here. But if you accept all of your definitions or the scope of each word, the fleeing and the how much do you think you have to read into domestic violence in terms of, as I understand it, your client was not part of the sort of domestic unit with the child and the other parent. Is that correct? In terms of living together or even sharing or even sharing? No, that's correct. Well, yes, I think at this specific time, they were sharing custody of the child. Mother and father were in different residences and the child was shared. And how do you grapple with that situation when you're talking about domestic violence in this context? Well, I think that if I'm understanding the court's question, the court's asking whether it is domestic violence for a parent. Let me sharpen a little bit. I apologize. I don't have much time. So you've got the combination of domestic violence and the fleeing. And my understanding, and obviously the government can explain their view, but that combination, I think, is not a fleeing if you have to go and pick up the child to run, right? And so that the fleeing would be we are fleeing together even if the child is the only victim. Well, I think they did flee together. And I think that seems logical. But I would to the court's concern about this area. Domestic violence in almost every state also includes physical force against someone you're in divorce proceedings with. So in your position, then, the proximity of living arrangements, permanency of living arrangements doesn't affect the analysis here? You know, I think you could stretch it out and find a place where it might affect it. And there is, for instance, in the, I think it was the Malka case that's cited by the court and the government where the people raised that as a defense to running back and trying to grab some children and take them away, saying we're really just protecting the children. And it turns out that those people had no legal relationship whatsoever. And so they weren't fleeing? Right. They weren't fleeing. But in this case, they had no real legal relationship with the child or any of the parents involved. And I think there is a general manner they thought they could protect this kid using this as a defense. That's certainly not the case here. This is the child's mother and the child's father. Is there any factual basis in the record that supports the affirmative defense? In other words, the child actually suffering some sort of domestic violence? Yes. So the transcript, which is at the district court docket number 93, it outlines the under, it is the transcript of the under seal hearing where we proffered and discussed things we'd previously filed under seal, which would presenting the testimony of the child who would testify to that. Now, I see I've hit the end of my time. And what I'd like to do with the court's permission is save anything else for rebuttal and any additional questions the court might have. Very well. Thank you.  Good afternoon. May it please the court. This case can start and end with the plain language of the statute. Congress chose to use the word fleeing, which as I put in my brief, has a clear distinction from rescuing. So, and I think the dictionary definitions that I provide in my brief also comport with common usage of those phrases and what Congress would have understood. What if this was a family unit where they were all living together and one parent is abusing the child and the other parent takes the child and flees. Is that fleeing or is that rescuing in your mind? I think that still falls under rescuing. I think the only time that in general usage you'd say I'm fleeing is if you yourself are facing the danger. What about the example that your opposing counsel gave of fleeing the ravages of war, for example, or the poverty in your country? And it may not be you. You may be running, fleeing with your children, fleeing to save them. Why is it just in this context that fleeing must be connected only to the defendant? And I would distinguish a case like that of collective fleeing where both the parent and the child are facing the danger. So if the country is at war and both parties are in danger, then they could collectively flee. That would fit with the common usage of that word. What if it was a situation where only children in that culture were at danger? Imagine something about a culture where the children were going to be indoctrinated in something and so the mother or the father flees with them to another country. Is that not fleeing? No, I think that's still a situation of rescuing the child from a condition that the mother feels is undesirable. And I admit Congress drew a line here. And there's certainly a valid public policy argument on creating a defense for a mother removing a child from a dangerous situation or from a perception of abuse. But that's not what Congress wrote here. And in drawing that line, they had some very particular concerns in mind. One is the idea of federalism, that state courts are traditionally the realm of deciding child custody disputes, child welfare disputes. They have both the investigative capacity and the legal structure to make those decisions, along with vastly more experience in that sort of litigation than the federal courts do. Is there anything about the context of the usage of this term or this statute as a whole that supports your position? Or are you relying just on that one word and its meaning? No, it extends beyond vocabulary alone. Congress left some other clues in the text. So for one, the full defense is the defendant is fleeing an incident or pattern of domestic violence. And again, by emphasizing that it's the defendant who is fleeing, that reinforces that it's the defendant who's facing the danger. But beyond that, Section 1204D refers to the Hague Convention. So Congress clearly had that in mind when it passed the statute. And the Hague Convention has a defense preventing return of the child if the party can prove the child faces a grave risk of danger if they're returned to the other country. So by not including that same sort of defense in 1204C, Congress is speaking by silence about the scope of the defense that they are creating. Additionally, when we talk about the policy decisions that Congress had in mind when drawing this line, when it is the mother, for instance, who is facing domestic violence against herself, Congress could reasonably determine that she is not as able to go through legal means to protect the child. That it's different... That's assuming that the child would be... You're assuming then the child is at risk too, but what if the child is not at risk with the other parent? It's just the fleeing defendant. Yeah, and that's exactly... That would fit under the statute if it's the one spouse who's subject to domestic violence and in her course of fleeing also takes the child. But I guess my point is if the child is not at risk, and the other spouse is just violent against the spouse. So I guess I'm not sure where that gets you because why you get to take the child from the other parent if the child is not at risk? Because that's what Congress said. And we're tied to what Congress said in interpreting the language of the statute. So is it sort of your position that in a situation such as this, where it's just the child, that the answer is that the other parent needs to stay in that country and use that country's local system to deal with that problem? Is that the idea? Exactly. And this is... It's not a situation where Congress is saying, we want to leave children in danger with an abusive parent. We're talking about a rather extreme response, which is removing the child, not just from the home where the abuser supposedly is, but also taking that child to a foreign country and intentionally retaining the child against the will and the orders of the state court. So Congress can draw that line. And I think it recognizes how much harder it is on that other parent to invoke their parental rights if the child is in another country where they might not even know where they are, but also have to somehow invoke the courts if they exist in the foreign country, which means hiring a lawyer in the foreign country, navigating a legal system that it's probably in a different language than their own, and inevitably drawing the state department in to make this child custody dispute. So it's not at all unreasonable that Congress created a limited defense that only applies when it's the defendant himself or herself who's fleeing the domestic violence. Now, going beyond just whether the defense exists as the defendant claims it does, the extra layer of the problem here is we don't have evidence in the record that would actually establish the defense. What is the evidence that the district court determined was admissible on this? So the court, and I think it's because the defense never explicitly made a specific offer of proof about exactly, there's some kind of offhand, well, we would call the preschool teachers or we would call so-and-so, but we never got the substance of what those people would testify to beyond the fact that they would be hearsay. Whatever they said about what the child told them would be hearsay. And in order to establish the defense would have to be admitted for the truth of the matter asserted because Congress said the defendant is fleeing domestic violence rather than a reasonable belief of domestic violence. So those statements would have to be offered for the truth of the matter asserted. And at the hearing that the court had, the pre-trial hearing, the defense could not muster any hearsay exception that would allow those statements to come in for the truth of the matter asserted. And what about the testimony of the child? What was the resolution there? There was no ultimate resolution there, although the district court was very skeptical that this child would be competent to testify based not only on his young age at the time of the events, he was three or four at the time of the supposed abuse, but also the gap of time between when the abuse supposedly occurred and when he would be testifying in court. And also the substantial proof that the mother had coached him on what to say to people. So for all those reasons, it's very unclear that the child would be competent to testify. And when we're looking at it on the back end, trying to decide harmless error, we don't have the record to decide it. And I want to highlight how judicially inefficient that is to first come here and argue, does the defense apply as the defendant conceptualizes it? But then if the court were to decide in his favor on that today and remand it, there's still going to be substantial questions about what evidence would be admitted and would the child be testifying. And the hints that the court strongly gave is that none of that would be at this point. And then we would be back here again to argue. So in your view, it hasn't been resolved at the district court? It was not finally resolved. Especially with whether the child would be competent to testify. The court referred to, we would probably have to get the child in for that in-camera review to determine if the child's competent to testify. That did not happen. But beyond that, the court very strongly hinted that none of the hearsay statements would be admitted for the truth of the matter asserted. Although I'm not sure that the court expressly said yea or nay on any of those. But again, we don't have any record of what those hearsay statements in particular would have been. So there's just no way for this court to decide that issue. And that's the failure of error preservation that stacks against the defense in this case. So for those reasons, the government has to let the court affirm. Thank you. Thank you. Thank you very much, Your Honors. So the government's argument is Congress drew a line by using the word flee. And then the government suggests that, well, to really know what what the word flee meant, we need to look to the words. The government's argument was that the clues are in the statute. So we're looking for clues for something that they say is clear and abundant in the statute. And then there is a hint as to what the court would have ruled. And the fact of the matter is, we argued and presented evidence and we even had a tape of the accusation of the child molestation. The court said, you can't even raise that defense. And we had proffered both under seal and at the under seal hearing. So in writing and before the court, what that evidence would have been. The court precluded the entire defense, which is very significant under Chapman. And the government argues against the Chapman harmless beyond a reasonable doubt argument by citing two cases, Seibel and Elbert. And the Seibel case was the issue of introducing evidence to support a defense, not the elimination of the whole defense, which we have here. And the Elbert case was the introduction of certain evidence that did not go to any of the elements of the offense for which the appellant Elbert was charged in that case. So did you provide a hearsay exception for your proffered witness statements? Well, first, the child obviously would not be proffered. Right. Right. For the other evidence. I know there were some questions about the child's testimony, but what about the rest of it? The court precluded the defense before I think we finished arguing it. But I would say this, a case cited by the government, U.S. versus Marcom, supports the proposition that evidence of actual molestation would be admissible over a hearsay objection. In that case, the question was whether there was a reasonable belief of abuse of a child. And the court said that reasonable the defense in this case, because impliably the Marcom court would have said, well, that doesn't even matter because the abuse has to be of the parent, not of the child. And two, the language in Marcom suggests very strongly that evidence of actual abuse, not suspected abuse, would be admissible over a hearsay exception. So no, we did not litigate it, but I think we would have had at least a fair swing at it. I'll submit it on that. Thank you very much, Your Honor. Well, thank you. I appreciate your appearance, especially this afternoon. And case is submitted. We'll issue an opinion in due course.